The next case is Stacey Burke v. Postmaster General. Ms. Maddox is here for the appellate and Mr. Letts Ring is here for the Postmaster General. Ms. Maddox, you may begin when you're ready. May it please the court, counsel. My name is Marie Maddox and I'm here on behalf of the appellant Stacey Burke. And we are here requesting that this court reverse the trial court's grant of a motion for a directed verdict at the conclusion of the plaintiff's case. And I will admit that I believe that the discrimination claim is a lot weaker than the retaliation claim. And I want to focus my attention here today on the retaliation claim and what happened in the retaliation. Before you talk about what led to the retaliation claim, could you elaborate a little bit on what the district court thought the record showed or did not show about anyone's knowledge that your client was Native American? In your brief, you said there's record evidence to support the opposite conclusion, but all you did was cite to a page and a half of the record. And I wonder what that page of the record shows. The page that only shows that Jennifer Lanier, that there had been a conversation between Ms. Burke and Ms. Lanier about her national origin. But the district court said that it was unclear when that was, when that took place. And Ms. Burke could not recall when that conversation with her supervisor had taken place. And this supervisor was the one who was involved in some or all of the disciplinary action? She was. That was Jennifer Lanier. And this started, if I could just briefly recite what the facts of this case show. Ms. Burke had been employed with the post office since 1995, blemish-free record up until April of 2013. And the district court found that there was this long history, and I think that the court said that she had a long history of sparring with management beginning in April of 2013. Let me ask you something about the procedural posture of the case. It's a bit unusual to my eyes. In the bench trial, no jury, that in the close of the plaintiff's case, the judge, instead of resolving the case factually, simply says that I should have granted summary rule against the plaintiff. But is he, in that posture, simply accepting as true all of the various, any potential factual conflicts? Are we, in the posture of reviewing, effectively a summary judgment? In effect, we said, okay, this is one way to answer it. Okay, I haven't heard all this. I should have granted a summary judgment. And so I'm granting a summary judgment right now. But it's an odd posture of . . . I would agree, Judge, after we had presented all of the evidence that we presented, and there are certain findings by the district court that are just clearly wrong. But I don't see why he's making findings and granting judgments as a matter of law. I'm sorry, I may not understand what you're, Honor, saying, but . . . I think Judge Higginbotham may be wondering about why, if the district court thought this was the right decision, it didn't just enter judgment on partial findings, as opposed to granting judgment as a matter of law, and going all the way through verdict, and then just simply saying, as a factual matter, I find that the supervisor did not know that your client was Native American, or I find that this discipline took place because there was purportedly a job violation. Although some of it might have been erroneous, but at the end of the day, I don't think there was anything discriminatory about what happened to your client. The question then would be whether that decision was wrong based on the evidence that we have presented to show . . . Let me go at it this way. What relief do you seek from this court? To reverse the directed verdict to enter it in favor of the defendant on both . . . And remand it to the district court for what? To remand to the district court for a trial on the merits of . . . Which you just concluded. Remand it to him to make findings of fact. Well, to remand it for a trial on the merits, because there were . . . Heard all of the plaintiff's evidence. And, Your Honor, respectfully, the district court erred in a number of ways. They may have, but I'm saying what the relief would be to send his case back to a judge who has heard all of the evidence in a trial. Yes, sir. Heard all of your evidence. He has ruled without even hearing from the other side. But with directions that the evidence that we presented, at least on the retaliation claim, actually supported a retaliation claim. Because if you look at the errors that were And if I could just go back for a minute to what the facts were. Because he found that there had been this history of problems and there had not been a history of problems. There had been two prior disciplinary actions before she filed her first NLRB charge. And when she filed the NLRB charge, what the court did was say that she did not have a good faith basis when she originally filed the NLRB charge. And then carried that through, fusing the requirements for the opposition clause and the participation clause. And that's where the first error occurred in finding that she did not How can there be an error if she was disciplined before she filed any charges of discrimination? How can there be retaliation? She has. For filing a charge of discrimination? Yes, sir. If the discipline occurred before the filing of the charge of discrimination? It did not occur before that. And we have never challenged the two original disciplinary actions. She said she did it. In April of 2013, she said, yes, I committed that error. The only issue that she had was the discipline that was imposed. And she challenged the discipline or her union representative challenged the discipline and they reduced it, I believe, to a letter of warning. So we have to look at the discipline that took place after the first charge of discrimination? After the NLRB charge. Okay. And look at the discipline. How many times was she disciplined after that? Six. Six times? Yes, sir. And it was, what happened, it was report, she reported something and then they immediately retaliated with disciplinary action. And then that got repeated all the way up until 2016 when her current supervisor, the current station manager then tore up the discipline that had been recommended again by Jennifer Lanier, tore it up and said, we're stopping this essentially right now. We're not going to go forward. And she has not been disciplined since. But what the district court found is that with respect to all of those disciplinary measures, there wasn't enough evidence to tie it to filing the charge of discrimination? There wasn't enough evidence to tie it to that? What the court found was that there was no causal connection. And the court also found that there was also legitimate reasons that had been offered by the defendant. And the only thing you have in order to counter that is temporal proximity? I've got temporal proximity because you have from the original NLRB charge where she did in fact claim discrimination. And in that time period, the time period where she was claiming that another employee had been given the overtime and that was between July, August of 2013 up until the time that she filed her NLRB charge. During that time period, there was an African-American employee, Tammy Gibson, who was getting the overtime. She went to the station manager, Mr. Pender, and complained about that. Then she filed the NLRB charge in which she claimed that this was discrimination based on her not getting the overtime and not being able to contact her union representative. That was on November 18, 2013. The following day, the day after she had complained to the NLRB about the discrimination, she immediately was told by Mr. Pender that no longer was there going to be a union book that she would have to go through and file a much more cumbersome union charge that she was not being able to see the union representative. And it never stopped from that point forward until Mr. Farias left. This is a Title VII case. What's the based on race, gender? It was originally based on her race. And she claimed that another employee, and that's why she said originally. She said she was a Native American? Yes, sir. But originally, this was a racial claim based on the overtime. That's what she reported to the NLRB. When she reported it to the NLRB, then when discipline started against her right after that. The evidence that the employer knew that she said she was a Native American? Your Honor, the, okay. She only had talked to Jennifer Lanier. And Jennifer Lanier was the only person, based on the record evidence that we have, that was the only person who knew that she was Native American. Was she a supervisor? She was. Yes, sir. Did she participate in any of the discipline? All of it. Except for the first one. It does not appear that she was still her supervisor. It looks like it was Mr. Pender from the first discipline back in December of 2013. But she originally said that she was discriminated against because she's white. She originally said that she was, I don't think she took that position, Your Honor. That's what the complaint said initially. She did. She said that she originally was discriminated against. And that was back at the time of the, and I see I've cut into my rebuttal time. But that was in the original time when she was, this is back in 2013 when she was not getting the overtime. And an African American employee was getting the overtime rather than her. And that was her original position. But looking at this case, though. Can I ask you something else, though? If you're talking about the three, three of the disciplines survived summary judgment, right? Three of them went to trial. Yes, sir. So that's what we're talking about now. Yes, sir. Okay. In the history, in the pattern. I mean, even though three, only three were found to be recoverable. Right. It doesn't mean the others can't be considered in the mosaic. But in terms of actionable retaliation, those three were the ones that were tried. Yes, sir. Okay. Two of them, again, I'm just looking at this as an outsider looking at a cold record. But two of them were initially because her code or her number appeared on something which was erroneous. That's correct. You think an employer doesn't have a basis for thinking that someone has done something wrong if his or her code or number appear on a mistake? And in two of those instances, once they figured out that it really wasn't her, they withdrew the discipline. They didn't withdraw the discipline. They never did. They only, the discipline was only withdrawn after she had appealed it through her union grievances. I know. That's what I mean. But the supervisors never withdrew it. Well, because the, but that's what the grievance process is for, to show the employer that it made a mistake, even though it might have been an honest mistake, and that the employee shouldn't pay the price for that mistake, and that happened twice. But didn't we present enough evidence to show and question the legitimacy of all of this discipline when we had a witness? Two of them, two of them had her code on a mistake. Where do you, where does an employer begin to think that a mistake originated if the mistake has an employee's coding on it? Because we had witnesses that testified to say, for example, let me use just the 12 miscans as an example. That you had a 204B, Mr. Covington, that had programmed in the scanning device that this other employee, Ms. Genevieve Huff, had used. And we had employees testify that they could program in different numbers on scanning devices. And it appears that those scanning devices were intentionally manipulated to put in Ms. Burke's number. By people who knew that she was Native American? No, sir. This is after, all of this occurred after she had, had filed her first charge. And so all of this had happened, and that's what... Why would people do it intentionally? Because they didn't like her? Because they thought she was Native American? Or because it was part of a conspiracy, or what? No, sir. It was all retaliatory after she began. And that's why I, when I first started today, I said that I think I'm going to have a tough time on the discrimination claim. So the retaliation is just because she was complaining and saying that certain things were not being done the right way, and complaining to the right bodies or authorities? Your Honor, she, she originally complained to her station manager, to Mr. Pender, and said, and this is in the August through November 2013 time period, and said, I am on the overtime list, and there is an African American employee who is getting the overtime. She's not on the, on the overtime list. And that's wrong. That's when she filed and said discrimination in the NLRB charge. So everything that came after that, she filed then four charges of discrimination, and related the first one back to the NLRB charge. So what we have is we've got participation clause activity beginning in December, November, December of 2013. And that never ended. She kept filing them. And so what we have, and what I've said before, is you've got a report, you've got a retaliatory action, a disciplinary action taken against her immediately thereafter, and that did not end until 2016 when those supervisors left. We've reserved some time, Ms. Maddox. Thank you. Mr. Letzring. May it please the court, good morning. Jonathan Letzring, Assistant United States Attorney on behalf of the appellee in this case. District Court's decision to grant the Postal Service's motion for judgment as a matter of law should be affirmed. Before I begin, I'd like to try to address a couple of points that came up. Your Honors, ask Ms. Maddox. She's pretty much conceded that the race claim is out. So why don't you use your time to talk about the retaliation claim. And I'll do that. Just one clarification. I just want to make sure that the record is clear. Judge Higubata asked a question. This trial, just so it's clear, I may have misheard you, but this was a jury trial. So this was not a bench trial. It was a jury trial. And that's at that point when the plaintiff had closed his case. That's when the judgment as a matter of law was decided. Now, on the retaliation claim, okay. The key part about that is this string of discipline begins before Ms. Burke ever files an EEO complaint. We have... She's complaining about the discipline that took place after the NLRB complaint then. What do you have to say about that? So the NLRB complaint, that is a red herring. The NLRB complaint, as the District Court looked at, that complaint mentions the word discrimination and it's talking about discrimination based upon union activity. There's nothing in that NLRB complaint that would put a reasonable employer on notice that Ms. Burke was in any way claiming race discrimination. So the notion... You're saying that whatever retaliation might have occurred, and I know you're not conceding that, is not actionable under Title VII. It may be actionable somewhere else under some other labor statute, but not under Title VII because the protected activity really wasn't protected. It wasn't a complaint based on one of the protected categories of Title VII. That's correct, Your Honor. So since April 25, 2013, which again is before Ms. Burke ever files her first EEO complaint, many supervisors of different races and genders, many of which may not have even known of Ms. Burke's EEO activity, determined on nine separate occasions that Ms. Burke failed to follow instructions and or failed to perform her duties. And as the Court can tell from looking at the record, much of this discipline related to express mail fares, which is the Coastal Service's premium product. Now on the retaliation claim, it's significant also that Ms. Burke didn't file her first EEO complaint until April 7, 2014, almost a year after the discipline began. And notably, in March of 2016, after all of the disciplinary actions that were at issue, the three that were at issue at trial, in March of 2016, a supervisor who had no involvement in any of the prior discipline, and her name was Ms. Chase, Linda Chase, recommended that Ms. Burke receive discipline. Now, ultimately, she didn't receive discipline, but there's record evidence, which is the disciplinary action request that was put in by Ms. Chase. Again, showing sort of on the front end before the EEO complaints and on the back end well after the EEO complaints, Ms. Burke was insubordinate and she was a problem employee that supervisors finally decided to try to do something about. The record demonstrates that each of the actions that were taken in this case were taken for legitimate, non-discriminatory, non-retaliatory reasons. And the increasing discipline that Ms. Burke faced over time was due to the progressive system of discipline that the post office employs. There was one complaint that she made where she did allege discrimination based on race, right? That is correct. And how many, before you continue explaining, how many disciplinary incidents took place after that complaint? Sure. Okay, so it's the July 7th, 2015 EEO complaint. That's the first time that we see Ms. Burke complain about race discrimination, okay? So there's only one disciplinary action that occurs after that, and that's the September 2015 misdelivery incident. At the condominium? At the condominium, that's right. Which were the wrong apartment. Right, and so. Was in question. Correct. Okay. And I can go into the facts on that if the court would like. No, I just wanted to place everything in a temporal line. I understand that. Right, right. So when Ms. Maddox was speaking earlier about the March 2015 incident, about how that was somehow retaliatory for EEO activity, the problem with that is the last EEO, the most recent EEO complaint that she had, that Ms. Burke had, at the time of the March 2015 incident was in September of 2014. So well outside any reasonable inference of causation. Well, why aren't these arguments that her lawyer, Ms. Maddox, can make to the jury, can, you know, you can make to the jury and she can argue against that? Why aren't these jury arguments? Well, Your Honor, under this circuit's precedent, under the court's law that has followed, these are, when no reasonable jury can find in favor of a plaintiff in an employment discrimination case, the case should not proceed. Title VII is an employment. But she can argue close temporal proximity, can't she? She can say, you can base your decision, ladies and gentlemen of the jury, on the fact that the discipline was imposed in close proximity to the time of the filing of these NLRB charges. Lucky if she'd make that argument to the jury and the jury can accept it. Because that is flawed as a matter of law. Because the notion that the NLRB charge, again, that's not protected activity under Title VII. So that argument would be improper as a matter of law. That's one thing. And, you know, one can't argue temporal proximity if your temporal proximity fails as a matter of law. And so you can't argue if you've got four or five months that go outside that window of two to three months that this court has said is sort of on the edges. You can't, you shouldn't be permitted to argue that because it can be decided as a matter of law. So even if the discipline was imposed the day after the NLRB charge, what if the supervisor says, what, you file an NLRB charge against me? You're suspended. Right. Even in that instance, it's not actionable? It's actionable, perhaps, but not under Title VII. Wrong forum. Well, you might have a First Amendment action, but you don't have one under Title VII, would you? I'm sorry? I said you may be a First Amendment claim of some sort, but I don't think I didn't see one in here. It's just Title VII. And so the answer to that is perhaps it is actionable if that were the facts. But certainly the NLRB charge, it's a little misleading because the disciplinary actions at issue at trial, there was not one right after the NLRB charge. The first one that comes that we're dealing with is the November 2014 charge. I was asking a hypothetical. I'm asking a hypothetical because you said the fact that it's an NLRB charge not based on Title VII doesn't make the retaliation claim actionable. So the answer to my question is if a supervisor said you filed an NLRB charge against me, I'm going to discipline you for coming in late for work for five minutes. You're saying that that would not be an actionable retaliation claim? Under Title VII. Unless, I think there's a possibility it could be under two facts were established. One, if the contents of the NLRB charge, I guess theoretically you wouldn't have an op, because it's the two prongs to a retaliation claim, right? So you wouldn't have a participation clause argument because you're not participating in a proceeding under Title VII. But theoretically, if the NLRB charge did, in fact, perhaps the plaintiff didn't know which paperwork to fill out, right? And so if a plaintiff filled out an NLRB charge and it's replete with statements that they feel like they're being discriminated against based upon their race or gender or whatever that may be, and that NLRB charge, we know there's knowledge that that person, the supervisor, got it that next day, and that supervisor then took action, I think that would be a very different case and one where there could be an argument that perhaps you're now engaging in opposition clause activity. And if it was a reasonable basis and you meet that test, then perhaps it could be. But that's not what we have here. So there's nothing about the NLRB charges that would in any way suggest that she feels like her status as a Native American is having an impact on her employment? Exactly. That's completely absent from the NLRB charge in this case. If we look at NLRB, the paperwork that she filed for the NLRB charges, is it in the record? It is. And if we go look at that paperwork, there's nothing in there about being a Native American? Correct. Okay. And I can give the court the site if it would like on the NLRB charge. What is the evidence of her being Native American other than that one conversation that she's had? Specifically, when did that conversation occur? Well, that's the problem. Ms. Burke can't remember and doesn't know when that conversation occurred. This is from the, I thought this might come up, this is from the trial transcript, page 216, line 24. I asked her, question, you don't know the month or the year on which you had a conversation with Ms. Lanier in which you said you told her you were Native American, correct? Answer, no, I cannot be exact. Question, so I'm correct, yes, I'm correct. Answer, yeah. So, she doesn't know when that conversation occurred. So, we don't know if Ms. Lanier had that knowledge at the time of any of these disciplinary actions. Well, what was the, when did the last disciplinary action take place? Sure. So, the last disciplinary action that takes place that went through discipline being imposed was the September 2015 incident. And so, your argument is that because at the time of trial, Ms. Burke was still a post office employee, that that conversation could have post dated all of the discipline. Could have, exactly. And in fact, Ms. Burke, there's record testimony that Ms. Burke said that Ms. Lanier was her supervisor up until, I believe she said, March of 2016. So, it could have happened anywhere in that time period, absolutely. And the notion that even if Ms. Burke had been able to establish that somehow Ms. Lanier knew she was Native American, the notion that these actions, these three disciplinary actions were taken on the basis of her being Native American, no reasonable jury could find that. There was an original admitted complaint that she alleged her status as a Native American. In the original complaint, she alleged that she was white. And when in the course of the litigation did she amend to say she was a Native American? I can look at the docket sheet and give you the date. I do believe it was fairly early on. I believe it was after we had filed a motion to dismiss. That was the amended complaint. The amended complaint corrected it to have that she was Native American. Correct. To a motion to dismiss. The motion to dismiss, I don't believe was tied to that specific issue.  Some of the district court's order reads like it's a factual finding as opposed to what a reasonable jury could have found. In other places, the district court says, no, this could have been a jury issue, but it doesn't make a difference anyways because of X, Y, and Z. But some of it reads like factual findings. Do you have the same impression or not? I didn't. But I think that the reason perhaps it has that impression is because I think the district court was trying to be very careful to construe the facts in the light most favorable to Ms. Burke and saying, okay, if I find based upon these facts, which I'm finding are in the light most favorable to her, no reasonable jury could find in her favor. So I think that's why it reads in that fashion. And if I may, the interesting thing about this case is when you look at the timeline of the EEO complaints and the discipline, it's a scenario really of reverse causal connection. It's a scenario where almost virtually every time Ms. Burke receives discipline, she filed an EEO complaint afterwards, attempting to use the EEO process as a sword essentially against management. And as the court can see, and as I pointed out in the brief on the issue of pretext, Ms. Burke relied upon conspiracy theories, far-fetched conclusory assertions that none of which are probative of pretext. But I assume in her EEOC complaint, she alleged her status as Native American? Not until July of 2015. Did she file an EEOC complaint without that? Yes. The earlier EEO complaints did not. So when did she first tell the EEOC she was Native American? The first time it comes up in an EEO formal complaint is July of 2015. And if I may, I hesitate to bring a case up that wasn't in my brief and I normally wouldn't do it, but Judge Higginbotham asked a couple of questions about the procedure. I think Judge Jordan, you asked, also raised some issues about kind of the unique procedural posture of this. And I just wanted to point out one case. I apparently was mistaken about that. I was confused when I read what the judge was doing, but apparently there was a jury then. Right. I just want to point this one case out because it's similar in terms of procedural posture, and it's a case called Vogel v. Orange County. And the site is 162 F. 3rd, 653, and it's 11th Circuit, 1998. And it's a similar situation procedurally in that the court, after the plaintiff had completed his case in chief, granted the motion for judgment as a matter of law, and then the case went up on appeal and the court affirmed. And the court sort of grappled with some of the procedural questions a couple of you have asked about. I see that I'm out of time. Thank you. I think we have your argument, Mr. Lessring. And we'll hear again from Ms. Maddox. Thank you. I think I can summarize our position in hopefully less than two minutes. This case has nothing to do, well, it does, but it doesn't, because I'm essentially conceding on the national origin and the race claim. So take that out of it completely. Okay. And let's focus on what she, on the retaliation claim. When she filed her NLRB charge, and this has been filed with the court, she said repeatedly, I have been discriminated against by failing to schedule me for overtime. She testified during the trial that she talked to her supervisor, the station manager, Mr. Pender, that that was based on an African-American employee, Tammy Gibson, getting the overtime rather than her. So in her NLRB charge, she repeatedly says two bases for the discrimination, not getting the overtime and not allowing her to have her union representation. But those, if I see that in an NLRB charge, you could interpret that in one of two ways. One is discrimination based on something akin to a Title VII protected category, but the other one is that the post office is not following the union contract and not letting me have seniority with regards to either a work assignment or as to overtime or the like, and they're letting somebody who was behind me in the bid line get preferential treatment, and I could describe that as discriminatory too. But she put meat on the bones. And the way that she did that was talking to Mr. Pender to tell him that another employee who was not on the overtime list was getting the overtime rather than her. But that's not racially discriminatory. Well, she felt that it was and had gone to Mr. Pender to report that. She told him that it was based on race? She said that she was being discriminated against. She did not say race. I know. That seems to me to be part of the problem because it doesn't matter what race or ethnicity the other employee had. If you thought that you were entitled to overtime over that employee because of seniority, the other employee's race or ethnicity or religion or color or anything else or gender doesn't really matter. That would go to the opposition clause activity with what she filed with the NLRB. Did she have a good faith belief when she originally filed the NLRB charge? I can see that the NLRB charge has to fall under the opposition clause. When she said another employee is getting overtime and I'm not, did she say and that other employee is an African-American? It would have been known. Her supervisor is also Mr. Pender's African-American, and she was pointing out that he was giving her the overtime. She did not say and the other employee is African-American because it's known. I mean, he's the one who's making the decision that she can get the overtime. Mr. Pender was. But I mean, there was some paperwork involved in filling out a charge. If we look at the paperwork, will it say an African-American is getting overtime and I'm not? No, sir. It says discriminated against. It just says discriminated and the meat that she put on the bones was when she told Mr. Pender that when she saw that it was Tammy Gibson. But this case is not about whether she is Native American. I have abandoned that. What it's about is the participation clause activity. It doesn't sound like it's about favoritism to African-Americans either. It was originally, Your Honor, and then. I understand where you are today. Well, what she testified to in trial was that she had been treated differently than an African-American employee, and that's what she had reported and gone to Mr. Pender about. But this case is about her participation clause activity. In this court's case, the EEOC versus Total Systems Services Inc. case, the 2000 case, where in participation clause activity, and that's what we're talking about. You don't go underneath to look at the good faith basis for the charge. And so that's. And if you look at her participation clause activity and what happened immediately after that, and we have successfully shown that the legitimate reasons that they've offered are just simply false. We brought in lots of witness testimony about that, the falsity of the reasons, and notwithstanding what the district court judge had held, those reasons were false, and we were able to prove that. The district judge observed, as I recall, something like that. Having listened to this evidence, he said, I was mistaken. This is a labor problem claim masquerading as a Title VII case. But isn't that a jury question? I'm not characterizing it. I'm just reminding you of the characterization of the judge who heard this evidence, was that he didn't see this as a race claim at all. Yes, sir. But when we have three employees that stand up and say, and they testified and said that she was singled out, she was prosecuted, she was disciplined too harshly, and this followed immediately after her EEO. Fifteen or sixteen times it was, yes. And it followed immediately, Your Honor, right after she had filed her EEO charges, and that's the participation clause activity. I appreciate it. Thank you. Thank you, Ms. Maddox.